IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ALTURNAMATS, INC., a Pennsylvania corporation, | ) | CIVIL ACTION NO: |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| GERALD HARRY, an individual, and SIGNATURE FENCING AND FLOORING SYSTEMS, LLC (a/k/a SIGNATURE SYSTEMS, LLC) t/d/b/a DURA DECK, a Delaware corporation, | ) | |
| | ) | |
| Defendants. | | |

### VERIFIED COMPLAINT

Alturnamats, Inc., by its undersigned counsel, sets forth its claim against Defendants Gerald Harry and Signature Fencing and Flooring Systems, LLC, (a/k/a Signature Systems, LLC) t/d/b/a DURA DECK, as follows:

1.     This case arises from the Defendants' intentional and egregious efforts to steal the rights and interests of the Plaintiff, Alturnamats, Inc. ("Alturnamats" or "Plaintiff") in its patented technology for portable flooring systems and its confidential information relating to, among, other things customer information and needs. Defendant Signature Fencing and Flooring Systems, LLC, (a/k/a Signature Systems, LLC) t/d/b/a DURA DECK ("Signature") learned of the Alturnamats product and confidential information while working in a position of trust with Alturnamats, i.e., as a dealer subject to contractual acknowledgement of Alturnamats rights in its confidential information. At some point by the middle of 2007, Signature determined to unfairly compete with Alturnamats and began to manufacture and sell infringing products. This was not enough for Signature, however. Having already crossed the line of patent infringement,

Signature looked for opportunities to avoid developing a customer network through its own time and resources, and it determined to directly steal Alturnamats clients by raiding Alturnamats and hiring its sales manager, Gerald Harry. Mr. Harry, despite having his own contractual obligations of confidentiality to Alturnamats, accepted a position with Signature on or about November 2, 2007, and since that time has been wrongfully diverting Alturnamats. The Defendants' wrongful actions have included patent infringement and violations of the Lanham Act, as well as breaches of and interference with Alturnamats' contractual rights and misappropriation. As a result of the Defendants' wrongful acts, Alturnamats has suffered and will continue to suffer irreparable and, in addition to any calculable damages, is therefore entitled to injunctive relief to prevent the Defendants from further benefiting from their wanton misconduct.

## THE PARTIES

2. Alturnamats, Inc. is a corporation incorporated under the laws of Pennsylvania with its principal place of business at 701 East Spring Street, Building 63, Titusville, Venango County, Pennsylvania, 16354.

3. Gerald Harry ("Harry") is an adult individual residing at 21 Glenwood Drive, Oil City, Pennsylvania 16301 and is an employee or agent of Defendant Signature Fencing and Flooring Systems, LLC.

4. Defendant Signature is a corporation incorporated under the laws of Delaware with its principal place of business at 50 E 42nd St. Suite 501, New York, New York 10017.

## JURISDICTION AND VENUE

5. Jurisdiction is based upon 35 U.S.C. § 283, The Patent Act; 28 U.S.C. § 1331, The Lanham Act; and 18 U.S.C. § 1030(A) and (B), The Computer Fraud and Abuse Act.

6.    Venue is proper in this District pursuant to 28 U.S.C. §1391 because a substantial part of the events giving rise to Plaintiff's claim occurred in this district.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

7.    As set forth more fully herein, Plaintiff seeks to recover damages from Defendants for Patent Infringement under the Patent Act, 28 U.S.C. § 1331 (Signature); Violations of the Lanham Act, 15 U.S.C. §1125(a)(Signature); Violations of the Computer Fraud and Abuse Act, 18 U.S.C. §1030 (both Defendants), Breach of Contract (Harry); Breach of the Duty of Loyalty (Harry); Breach of Contract (Signature); Misappropriation of Trade Secrets (both Defendants); Intentional Interference with Contractual Relations (Signature); (Intentional Interference with Prospective Economic Advantages)(both Defendants); and Conspiracy (both Defendants).

## ALTURNAMATS' PRODUCTS AND PROTECTION OF ITS INTELLECTUAL PROPERTY

8.    Alturnamats is in the business of manufacturing and providing interlocking portable flooring systems and roadways for turf and landscaped area protection.

9.    Alturnamats is the owner by assignment of United States Patent No. 5, 807, 021 (the "Alturnamats' Patent"), issued on September 15, 1998 and titled "Ground Cover Mat Manufactured From Recycled Plastic." A true and correct copy of the Alturnamats' Patent is attached hereto as Exhibit "A."

10.    In addition to obtaining a patent on its products, Alturnamats has compiled considerable confidential and proprietary information and trade secrets concerning its products and its other technology and has developed valuable business relations by expending substantial amounts of time, money and other resources to, among other things:

    a.    Develop, manufacture and produce its portable flooring systems;

b.   Locate and develop relationships with dealers and distributors to sell and lease its portable flooring systems;

c.   Promote and sell its portable storing systems and its other products;

d.   Educate and familiarize its dealers, distributors, customers and prospective customers with respect to its portable flooring systems;

e.   Determine the particular needs, problems and requirements of its dealers, distributors, customers and potential customers;

f.   Compile confidential trade data, statistics, pricing data, leads, prospects and other information related its dealers, distributors, customers' and potential customers' businesses; and

g.   Train its employees in all aspects of its business.

11.   The foregoing confidential and proprietary information and trade secrets compiled and developed by Alturnamats and referred to in Paragraph 9 above (hereinafter the "Confidential Information") is not readily available or easily discoverable from any public source and, therefore, cannot be easily or properly acquired by Alturnamats' competitors.

12.   Alturnamats has endeavored at all times material hereto to keep the Confidential Information confidential and out of the possession of others, particularly its competitors. Accordingly, Alturnamats' Confidential Information provides it with an advantage over its competitors who do not possess said information.

13.   All of Alturnamats' employees are instructed and advised as to the sensitive, proprietary, and confidential nature of the Confidential Information. Further, all employees with access to Confidential Information have been at all times material hereto instructed that such Confidential Information is to be used only in connection with their employment duties and responsibilities for Alturnamats.

14.     Alturnamats has an established network of dealers who sell and distribute Alturnamats' products to a wide variety of customers in different industries, including utilities and construction, manufactured housing, municipalities, schools and the military.

15.     All of Alturnamats' dealer are advised as to the sensitive, proprietary, and confidential nature of the Confidential Information and have agreed pursuant to contracts to keep such information confidential.

## SIGNATURE HAS INFRINGED ON ALTURNAMATS' PATENT AND FALSELY ADVERTISED ITS PRODUCT

16.     Signature has been a long time dealer and distributor of Alturnamats' products.

17.     With the permission of Alturnamats, Signature distributed the Alturnamats products labeled as: "DURA DECK", with Alturnamats noted as the manufacturer.

18.     Alturnamats recently learned that Signature has started manufacturing and/or producing its own portable flooring systems and/or its own products which are substantially similar to the portable flooring systems manufactured and/or produced by Alturnamats and infringing on Alturnamats' patent.

19.     Signature is marketing and selling its own manufactured and/or produced portable flooring systems and/or products as "DURA DECK".

20.     Upon information and belief, Signature did not manufacture and/or produce and/or sell its own portable interlocking flooring systems and/or other products until the summer of 2007.

21.     Signature has infringed, contributorily infringed and/or actively induced infringement, of the Alturnamats Patent in the United States by making, using, offering to sell, or selling Signature's "DURA DECK" flooring systems.

22. Further, Alturnamants recently discovered that Signature, via its website, is falsely marketing and advertising its portable flooring product through the use of photographs of Alturamats' products.

23. Upon information and belief, Signature has been planning to compete unfairly with Alturnamats for some time, the first step of such unfair competition being their infringement of the Alturnamats' Patent.

## SIGNATURE'S AGREEMENT WITH ALTURNAMATS

24. On February 28, 2005, Alturnamats and Signature entered into a Sales Agreement ("Sales Agreement") pursuant to which Alturnamats appointed Signature as an independent Dealer of Alturnamats' products. A copy of the Sales Agreement is attached as Exhibit "B".

25. Pursuant to Paragraph 7 of the Sales Agreement, entitled "Covenants Against Disclosure and Competition", Signature agreed "not to disclose to any other person, or use in any way any confidential information of Alturnamats, Inc. for the duration of this agreement and for a period of ten (10) years following the termination of this agreement. See Exhibit B.

26. The term "Confidential Information" was defined in the Sales Agreement includes: "all data, quotations, specifications, designs, plans, knowledge and other technical or business information, whether reduced to writing or not, or whether disclosed by inspection of Alturnamats, Inc. facilities or documents or by conversation with Alturnamats, Inc. employees and whether reduced to practice or not by Alturnamats, Inc." See Exhibit B.

27. As a consequence of the Sales Agreement and in connection with its position as Alturnamats' dealer and distributor, Signature was provided with and maintained and possessed Alturnamats' Confidential Information including, but not limited to data, quotations, specifications, designs, plans, knowledge and other technical or business information, as well as

Alturnamats' dealer lists and network, distributor information, bidding and pricing structures, technical information on products, and information on manufacturing, testing, developing and supplying products, financial statements, training manuals and guides, and/or marketing systems or plans.

### GERALD HARRY'S EMPLOYMENT WITH ALTURNAMATS

28.    From January 1, 2001 until November 2, 2007, Defendant Gerald Harry employed by Alturnamats as a sales manager whose duties involved managing the sales operations of the company, distribution, dealer setup, dealer recruitment and customer service.

29.    During his employment with Alturnamats, Harry received a complete copy of Alturnamats' Employee Handbook.

30.    Alturnamats' Employee Handbook imposes confidentiality obligations on its employees which specifically prohibit employees, both during and after employment, from: (i) divulging or disclosing confidential information about the company, its products, its customers, suppliers and vendors; (ii) divulging or disclosing any records and files of the company; and (iii) from using any confidential information obtained through or during employment with Alturnamats for the purpose of furthering current of future outside employment or activities or for obtaining personal gain or profit.    A true and correct copy of Alturnamats' Employee Handbook is attached hereto as Exhibit "C".

31.    Specifically, Section M of the Employee Handbook provides that: "Information about the Company and EmploShare, its Employees, customers, suppliers, and vendors is to be kept confidential and divulged only to individuals within the Company with both a need to receive and authorization to receive the information.    If in doubt as to whether information

should be divulged, err in favor of not divulging information and discuss the situation with your Supervisor." <u>See</u> Exhibit C.

32.     Further, Alturnamats' Employee Handbook provides that: "All records and files maintained by the Company and EmployShare are confidential and remain the property of the Company and EmployShare.  Records and files are not to be disclosed to any outside party without the express permission of the President of the Company and/or the General Manager of EmployShare." <u>See</u> Exhibit C.

33.     Pursuant to Alturnamats' Employee Handbook: "Confidential information includes, but is in no way limited to: financial records, business, marketing, and strategic plans, personnel and payroll records regarding current and former Employees, the identity of, contact information for, and any other account information on customers, vendors, and suppliers, inventions, programs, trade secrets, formulas, techniques, and processes, and any other documents or information regarding the Company's operations, procedures, or practices. Confidential information may not be removed from Company premises without express authorization." <u>See</u> Exhibit C.

34.     Pursuant to Alturnamats' Employee Handbook: "Confidential information obtained during or through employment with the Company may not be used by any Employee for the purpose of furthering current or future outside employment or activities or for obtaining personal gain or profit." <u>See</u> Exhibit C.

35.     Pursuant to Alturnamats' Employee Handbook:  "The Company and EmployShare reserve the right to avail itself of all legal or equitable remedies to prevent impermissible use of confidential information or to recover damages incurred as a result of the impermissible use of confidential information." <u>See</u> Exhibit C.

36.     Pursuant to Alturnamats' Employee Handbook, the "Company's computer, voicemail, electronic mail (e-mail), or telephone systems and the data stored on them are and remain at all times the property of the Company. <u>See</u> Exhibit C.

37.     Pursuant to Alturnamats' Employee Handbook, if an employee decides to voluntarily leave employment, Alturnamats asks for "at least two weeks written notice." Further, prior to the employee's departure, the employee is to "return all property owned by the Company (e.g., vehicles, computers, keys, uniforms, identification badges, credit cards)." <u>See</u> Exhibit C, p. 40.

38.     On April 20, 2007, Harry signed an "Acknowledgment and Agreement" ("Acknowledgment and Agreement") acknowledging that he had reviewed and received the Alturnamats Employee Handbook and agreeing to be bound by the entire handbook, including the above policies and confidentiality obligations, during and following his term of employment with Alturnamats. A true and correct copy of the Acknowledgment and Agreement is attached hereto as Exhibit "D."

39.     Alturnamats provided Harry with employment, wages, bonuses, benefits, training and access to confidential and proprietary information and trade secrets as consideration for his acknowledgment and agreement to abide by the policies and confidentiality obligations set forth in Alturnamats' Employee Handbook ("Confidentiality Obligations").

40.     In the course of his employment with Alturnamats, Harry was placed in a position of trust and confidence.

41.     As a consequence of the trust and confidence afforded to Harry by Alturnamats and in connection with his duties and responsibilities for Alturnamats, Harry was provided with and maintained and possessed Alturnamats' Confidential Information including, but not limited

to Alturnamats' dealer lists and network, customer lists, distributor information, bidding and pricing structures, technical information on products, and information on manufacturing, testing, developing and supplying products, financial statements, customer information, training manuals and guides, and/or marketing systems or plans.

42. At all times material hereto, Harry knew of the sensitive, proprietary, and confidential nature of Alturnamats' Confidential Information.

43. At all times material hereto, Harry was aware that Alturnamats' Confidential Information was intended to be used solely and exclusively in connection with his employment with Alturnamats.

44. While employed by Alturnamats, Harry received a significant amount of Confidential Information concerning its products, dealers, customers, marketing, and financial information. Alturnamats vigorously maintains the secrecy of this Confidential Information, and Harry would not have had access to that information but for the relationship of trust and confidence between him and Harry.

## SIGNATURE AND HARRY HAVE CONSPIRED TO UNFAIRLY COMPETE WITH ALTURNAMATS

45. On November 2, 2007, Harry submitted a notice of termination, effective immediately, from his position at Alturnamats as a sales manager.

46. Prior to his resignation from Alturnamats, Harry was discussing taking a sales position with Signature of at least six weeks and was at the same time continuing to work with Alturnamats' customers.

47. Upon information and belief, Harry immediately accepted a position with Signature following his resignation from Alturnamats as Vice President of Matting & Industrial Sales.

48.     Upon information and belief, Harry is, and will be performing the same or similar job functions for Signature that he previously performed for Alturnamats.

49.     Alturnamats recently learned that Harry and/or Signature are attempting to divert Alturnamats' customers and distributors to Signature's portable flooring systems.

50.     Specifically, Alturnamats recently learned that one of its potential customers for a flooring system, Sandvik Group ("Sandvik"), had been contacted by employees of Signature including but not limited to Harry.

51.     Prior to his resignation, Harry advised Alturnamats that Sandvik had chosen Alturnamats as its continued provider of portable flooring systems.

52.     On October 30, 2007, two days before his resignation, Harry advised Sandvik that he would be meeting with them the following week – when he knew he would no longer be working for Alturnamats.

53.     Following Harry's resignation, Sandvik advised Alturnamats that it would be purchasing its interlocking portable flooring system from Signature rather than Alturnamats.

54.     Upon information and belief, Sandvik has now purchased or will be purchasing interlocking flooring systems from Signature.

55.     As a result, Alturnamats has experienced, and will continue to experience, a significant loss of revenue.

56.     Further, Alturnamats' other sales have already significantly decreased after Harry departure.

57.     Upon information and belief, Harry and/or Signature utilized and/or disclosed Alturnamats' Confidential Information to develop, manufacture, produce, market and/or advertise Signature's portable flooring systems.

58.     Upon information and belief, Harry and/or Signature has utilized and/or disclosed Alturnamats' Confidential Information in order to unfairly gain a competitive advantage to successfully solicit and/or divert Alturnamats' dealers, distributors and customers.

59.     Upon information and belief, before he terminated his employment with Alturnamats, Harry accessed his Alturnamats' laptop and deleted and/or appropriated messages and/or documents and/or files, which constitute Company property from the laptop; such deletion being an apparent effort to destroy and/or disguise his covert actions with or on behalf of Signature before his termination.

60.     Upon information and belief, Harry failed to return property of Alturnamats to the company prior to his departure employment, including but not limited to a rolodex and daytimer and/or calendar.

61.     Indeed, only after receiving a letter from Alturnamats advising him of his obligations following his termination did Harry return other confidential information to Alturnamats.

62.     Given the similarity between the products Harry is now attempting to manufacture, develop and/or market for Signature and the products he marketed and/or sold while employed by Alturnamats, the fact that he is soliciting the same dealers, distributors and customers he called upon while employed by Alturnamats and the fact that Harry is performing a similar job function at Signature that he performed at Alturnamats, it would be impossible for Harry to perform his job at Signature without drawing on knowledge he possesses of Alturnamats' confidential information.

63.     Given the similarity between the products Harry is now attempting to manufacture, develop and/or market for Signature and the products he marketed and/or sold

while employed by Alturnamats, the fact that he is soliciting the same dealers, distributors and customers he called upon while employed by Alturnamats and the fact that Harry is performing a similar job function at Signature that he performed at Alturnamats, the wrongful use and/or disclosure of Alturnamats' Confidential Information, if it has not occurred already, is inevitable.

## COUNT I

## PATENT INFRINGEMENT

## ALTURNAMATS, INC. v. SIGNATURE

64.     Paragraphs 1 through 63 of the Complaint are hereby incorporated by reference as though the same were fully set forth herein.

65.     Alturnamats is the owner by assignment of the Alturnamats' Patent, United States Patent No. 5, 807, 021, issued on September 15, 1998 and titled "Ground Cover Mat Manufactured From Recycled Plastic". See Exhibit "A."

66.     The Alturnamats Patent discloses and claims innovative and valuable inventions relating to Alturnamats' ground cover mats and interlocking portable flooring systems and roadways for turf and landscaped area protection.

67.     Signature has infringed, contributorily infringed and/or actively induced infringement, and is infringing, contributorily infringing and/or actively inducing infringement of the Alturnamats Patent in the United States by at least making, using, offering to sell, selling, causing to be made, causing to be used, causing to be offered for sale, and/or causing to be sold products that infringe one or more of the claims of the Alturnamats Patent. Such infringement includes "Dura Deck" products and services, including but not limited to those provided under the "Dura Deck" designation and/or the "DD1", "DD2", and "DD3" designations.

68. On information and belief, Signature's infringement, contributory infringement and/or active inducement of others' infringement of the Alturnamats Patent have taken place with full knowledge of the Alturnamats Patent and has been intentional, deliberate and willful, making this an exceptional case entitling Plaintiff to increased damages and reasonable attorneys' fees pursuant to 35 U.S.C. §§ 284 and 285.

69. By reason of the foregoing, Plaintiff has been damaged and will continue to be damaged, and has suffered and will continue to suffer irreparable loss and harm.

WHEREFORE, Alturnamats requests that this Court grant it equitable and other relief, and enter judgment that:

a. Signature, its officers, agents, servants and employees be preliminarily and permanently enjoined from infringing Plaintiff's Patent pursuant to 35 U.S.C. § 283;

b. Signature has infringed Plaintiff's Patent;

c. Signature be found liable to Plaintiff for its acts of infringement and be ordered to pay damages pursuant to 35 U.S.C. § 284 as a result of infringement of Plaintiff's Patent, and all damages suffered by Plaintiff as a result of the infringement;

d. This case is exceptional under 35 U.S.C. § 285 and that Signature be ordered to pay treble damages and the expense and costs incurred by Plaintiff, including reasonable attorney's fees;

e. Plaintiff be awarded its costs and prejudgment interest on all damages pursuant to 35 U.S.C. § 284 ; and

f. Plaintiff be awarded such further relief as the court may deem appropriate.

## COUNT II

### FALSE ADVERTISING

### ALTURNAMATS, INC. v. SIGNATURE

70.     Paragraphs 1 through 69 of the Complaint are hereby incorporated by reference as though the same were fully set forth herein.

71.     Signature's website advertises its "DURA DECK" product with photographs of Alturnamats' products.  The website reaches customers nationwide and, upon information and belief, Signature's products are sold in interstate commerce.

72.     Further, with the permission of Alturnamats, Signature previously distributed the Alturnamats products labeled as:  "DURA DECK", with Alturnamats noted as the manufacturer.

73.     Upon information and belief, Signature is now manufacturing and selling its own portable flooring systems as "DURA DECK".

74.     These representations made by Signature misrepresent the nature, characteristics and/or qualities of Signature's DURA DECK product and have caused and/or are likely to cause customer confusion with Alturnamats' products, in contravention to the prohibitions of 15 U.S.C. §1125(a)(1)(a) and (a)(1)(b).

75.     Upon information and belief, the false advertising of Signature was and is deliberate, willful, malicious, oppressive, and without regard to Alturnamats' proprietary rights.

76.     The false advertising of Signature has caused, and will continue to cause substantial injuries, loss and damage to Alturnamats' proprietary and exclusive intellectual property rights and further has damaged Alturnamats' by diverting Alturnamats' customers and profits, all in an amount not yet ascertained.

77. The false advertising of Signature has caused and will continue to cause, Alturnamats immediate and irreparable injury. It would be difficult to ascertain the amount of money damages that would afford Alturnamats adequate relief at law. As Alturnamats' legal remedy is not adequate, Signature should be enjoined and restrained from their actions.

WHEREFORE, Alturnamats requests that this Court grant it equitable and other relief, and enter judgment against Signature for violations of the Lanham Act, 15 U.S.C. § 1125(a), plus interest thereon at the highest rate allowed by law, court costs and attorney's fees and ordering that Signature be enjoined and restrained from their actions that constitute false advertising under the Lanham Act, 15 U.S.C. §1125(a).

### COUNT III

### VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT, 18, U.S.C. § 1030

### ALTURNAMATS, INC. v. DEFENDANTS

78. Paragraphs 1 through 77 of the Complaint are hereby incorporated by reference as though the same were fully set forth herein.

79. Upon information and belief, as a part of Defendants' conspiracy to misappropriate and obtain the benefit of Alturnamats' trade secrets, Signature, by its agent and employee Harry, knowingly and with intent to defraud, accessed a protected computer of Alturnamats without authorization or by exceeding such authorization as was granted by Alturnamats to Harry and as a result, furthered their conspiracy and intended fraud and obtained valuable information of Alturnamats having a value in excess of $5,000 in the year 2007.

80. By reason of the foregoing, Defendants have knowingly, intentionally and willfully engaged in violations of the Computer Fraud and Abuse Act, 18 U.S.C. §1030.

-16-

81.     As a direct and proximate result of Defendants unlawful conduct, Defendants have damaged Alturnamats and will continue to damage Alturnamats and cause Alturnamats immediate and irreparable harm and injury.  Unless Defendants are enjoined by this Court, Alturnamats has no adequate remedy at law and further immediate and irreparable injury to Alturnamats increases with each and every continuing violation of the Computer Fraud and Abuse Act by Defendants.

WHEREFORE, Alturnamats requests that this Court grant it equitable and other relief, and enter judgment:

a.     That Signature, its officers, agents, servants and employees be preliminarily and permanently enjoined from using and/or disclosing any information obtained from Alturnamats' computers;

b.     Directing Harry and/or Signature to return to Alturnamats any of Alturnamats' property in his possession, custody or control;

c.     Against all Defendants for violation of the Computer Fraud and Abuse Act, plus interest thereon at the highest rate allowed by law, court costs and attorneys' fees.

## COUNT IV

## BREACH OF CONTRACT

### ALTURNAMATS, INC. v. GERALD HARRY

82.     Paragraphs 1 through 81 of this Complaint are hereby incorporated by reference as though the same were fully set forth herein.

83.     Through the Acknowledgement and Agreement, Harry agreed to abide by the Confidentiality Obligations set forth in Alturnamats' Employee Handbook.  These obligations are consistent with and amplify Harry's implied common law contractual duty of confidentiality.

84.     Upon information and belief, Harry has engaged, and continues to engage, in wrongful conduct in breach of the Confidentiality Obligations imposed by the Employee Handbook and Acknowledgment and Agreement.

85.     The wrongful disclosure and/or use of the Confidential Information, if it has not occurred already, is inevitable given the similarity between the job Harry performed at Alturnamats and the job he is performing for Signature, the similarity between the products Harry is now attempting to develop and/or market for Signature and the products he developed and/or marketed while employed by Alturnamats, and the fact that he is soliciting the same customers and/or dealers he called upon while employed by Alturnamats.

86.     It would be impossible for Harry to perform his job for Signature without drawing on the knowledge he possesses of Alturnamats' Confidential Information given the similarity between the job Harry performed at Alturnamats and the job he is performing for Signature, the similarity between the products Harry is now attempting to develop and/or market for Signature and the products he developed and/or marketed while employed by Alturnamats, and the fact that he is soliciting the same customers and/or dealers he called upon while employed by Alturnamats.

87.     All conditions precedent to the enforcement of Harry's Confidentiality Obligations imposed by the Employee Handbook and Acknowledgment and Agreement have occurred or have been performed, excused, waived or otherwise discharged.

88.     As a direct and proximate result of Harry's breach of the Confidentiality Obligations and other obligations imposed by the Employee Handbook and Acknowledgment and Agreement, Alturnamats has suffered and will suffer substantial damages, including but not

limited to the impairment or destruction of the Confidential Information, loss of Company property, loss of goodwill and dealer and/or customer relationships and lost profits.

89.     The threatened and/or actual injuries that Alturnamats has suffered and/or will suffer are immediate and irreparable. Because of the difficulty in quantifying injury and harm to Alturnamats' ability to compete and to maintain a competitive advantage through its Confidential Information and valuable dealer, distributor, customer and prospective customer relations, as well as the harm resulting from Harry's wrongful possession and use of the Confidential Information, monetary damages alone will not fully compensate Alturnamats for Harry's wrongful conduct. Alturnamats therefore lacks an adequate and complete remedy at law.

90.     As a direct and proximate result of Harry's' conduct alleged herein, Alturnamats is in imminent danger of suffering irreparable harm in the following respects:

    a.    Alturnamats will lose valuable relationships with its dealers, distributors, customers and prospective customers;

    b.    Alturnamats will lose valuable contracts, sale opportunities, orders, and profits;

    c.    Alturnamats' goodwill, reputation, and standing in the business community will be injured;

    d.    The confidentiality and proprietary nature of Alturnamats' Confidential Information will be destroyed and/or seriously impaired;

    e.    Alturnamats will lose the competitive advantage afforded by its Confidential Information;

    f.    Alturnamats will lose the benefit of its investment of time, money, and other resources in compiling and developing such Confidential Information;

    g.    Alturnamats' employees will suffer the loss of morale by virtue of the loss of its existing customer base.

WHEREFORE, Alturnamats requests that this Court grant it equitable and other relief, and enter judgment:

a      Preliminarily enjoining and restraining, and, after a final hearing, permanently enjoining and restraining, Harry from:

    (i)     Employment with Signature; and

    (ii)    Selling to any actual or prospective customers of Alturnamats;

    (iii)   Developing and/or marketing any product that in any way utilizes or relies upon Alturnamats' Confidential Information;

    (iv)   Contacting and/or communicating with any and all dealers, distributors, and/or customers he serviced while employed by Alturnamats for the purpose of soliciting, inducing, encouraging, or otherwise persuading such dealers, distributors or customers to distribute, sell, and/or purchase from Signature; and

    (v)    Appropriating, disclosing, taking advantage of, or using in any other manner whatsoever Alturnamats' Confidential Information or any other property belonging to Alturnamats.

b.    Directing Harry to return to Alturnamats any of Alturnamats' property in his possession, custody or control, as well as any other documents that contain, reflect, refer, or relate in any way to Alturnamats' Confidential Information, in whole or in part;

c.    Against Harry for compensatory damages in such amount as shall be determined at trial that Alturnamats has sustained as a consequence of Harry's conduct;

d.    For such other relief as this Court may deem appropriate.

**COUNT V**

**BREACH OF DUTY OF LOYALTY**

**ALTURNAMATS, INC. v. GERALD HARRY**

91.     Paragraphs 1 through 90 of this Complaint are hereby incorporated by reference as though the same were fully set forth herein.

92.     As one of Alturnamats' sales managers, Harry was Alturnamats' employee and agent and was responsible for the sales operations of the company, distribution, dealer setup, dealer recruitment and customer service.

93.     As Alturnamats' employee and agent, Harry owed Alturnamats a duty of loyalty to act in all matters affecting the subject of his employment and agency in the utmost good faith and in the furtherance and advancement of Alturnamats' interests.

94.     The wrongful disclosure and/or use of the Confidential Information, if it has not occurred already, is inevitable given the similarity between the job Harry performed at Alturnamats and the job he is performing for Signature, the similarity between the products Harry is now attempting to develop and/or market for Signature and the products he developed and/or marketed while employed by Alturnamats, and the fact that he is soliciting the same customers and/or dealers he called upon while employed by Alturnamats.

95.     It would be impossible for Harry to perform his job for Signature without drawing on the knowledge he possesses of Alturnamats' Confidential Information given the similarity between the job Harry performed at Alturnamats and the job he is performing for Signature, the similarity between the products Harry is now attempting to develop and/or market for Signature and the products he developed and/or marketed while employed by Alturnamats, and the fact that

he is soliciting the same customers and/or dealers he called upon while employed by Alturnamats.

96. By the conduct described above, including but not limited to inevitably disclosing Alturnamats Confidential Information and trade secrets to Signature, Harry has materially breached his duty of loyalty to Alturnamats.

97. The threatened and/or actual injuries that Alturnamats has suffered and/or will suffer are immediate and irreparable. Because of the difficulty in quantifying injury and harm to Alturnamats' ability to compete and to maintain a competitive advantage through its Confidential Information and valuable dealer, distributor, customer and prospective customer relations, as well as the harm resulting from Harry's wrongful possession and use of the Confidential Information, monetary damages alone will not fully compensate Alturnamats for Harry's wrongful conduct. Alturnamats therefore lacks an adequate and complete remedy at law.

98. As a direct and proximate result of Harry's' conduct alleged herein, Alturnamats is in imminent danger of suffering irreparable harm in the following respects:

        a.     Alturnamats will lose valuable relationships with its dealers, distributors, customers and prospective customers;

        b.     Alturnamats will lose valuable contracts, sale opportunities, orders, and profits;

        c.     Alturnamats' goodwill, reputation, and standing in the business community will be injured;

        d.     The confidentiality and proprietary nature of Alturnamats' Confidential Information will be destroyed and/or seriously impaired;

        e.     Alturnamats will lose the competitive advantage afforded by its Confidential Information;

f.     Alturnamats will lose the benefit of its investment of time, money, and other resources in compiling and developing such Confidential Information;

g.     Alturnamats' employees will suffer the loss of morale by virtue of the loss of its existing customer base.

WHEREFORE, Alturnamats requests that this Court grant it equitable and other relief, and enter judgment:

a.     Preliminarily enjoining and restraining, and, after a final hearing, permanently enjoining and restraining, Harry from:

     (i)     Employment with Signature and;

     (ii)     Developing and/or marketing any product that in any way utilizes or relies upon Alturnamats' Confidential Information;

     (iii)     Contacting and/or communicating with any and all dealers, distributors, and/or customers he serviced while employed by Alturnamats for the purpose of soliciting, inducing, encouraging, or otherwise persuading such dealers, distributors or customers to distribute, sell, and/or purchase from Signature; and

     (iv)     Appropriating, disclosing, taking advantage of, or using in any other manner whatsoever Alturnamats' Confidential Information or any other property belonging to Alturnamats.

b.     Directing Harry to return to Alturnamats any of Alturnamats' property in his possession, custody or control, as well as any other documents that contain, reflect, refer, or relate in any way to Alturnamats' Confidential Information, in whole or in part;

c.     Against Harry for compensatory damages in such amount as shall be determined at trial that Alturnamats has sustained as a consequence of Harry's conduct;

d.     For such other relief as this Court may deem appropriate.

## COUNT VI

## BREACH OF CONTRACT

## ALTURNAMATS, INC. v. SIGNATURE

99.    Paragraphs 1 through 98 of this Complaint are hereby incorporated by reference as though the same were fully set forth herein.

100.    Pursuant to the Sales Agreement, in exchange for the right to distribute Alturnamats' products, Signature agreed not to disclose, or use in any way, Alturnamats' Confidential Information.

101.    Upon information and belief, in breach of the obligations imposed by the Sales Agreement, Signature has utilized and/or disclosed Alturnamats' Confidential Information in order gain a competitive advantage to successfully solicit and/or divert Alturnamats' dealers, distributors and customers.

102.    Upon information and belief, Signature has engaged, and continues to engage, in wrongful conduct in breach of the obligations imposed by the Sales Agreement.

103.    All conditions precedent to the enforcement of the obligations imposed by the Sales Agreement have occurred or have been performed, excused, waived or otherwise discharged.

104.    As a direct and proximate result of Signature's breach of the Sales Agreement, Alturnamats has suffered and will suffer substantial damages, including but not limited to the impairment or destruction of Confidential Information, loss of Company property, loss of goodwill and dealer and/or customer relationships and lost profits.

105.    The threatened and/or actual injuries that Alturnamats has suffered and/or will suffer are immediate and irreparable. Because of the difficulty in quantifying injury and harm to

-24-

Alturnamats' ability to compete and to maintain a competitive advantage through its confidential information and valuable dealer, distributor, customer and prospective customer relations, as well as the harm resulting from Signature's wrongful possession and use of confidential information, monetary damages alone will not fully compensate Alturnamats for Signature's wrongful conduct. Alturnamats therefore lacks an adequate and complete remedy at law.

106.    As a direct and proximate result of Signature's conduct alleged herein, Alturnamats is in imminent danger of suffering irreparable harm in the following respects:

a.    Alturnamats will lose valuable relationships with its dealers, distributors, customers and prospective customers;

b.    Alturnamats will lose valuable contracts, sale opportunities, orders, and profits;

c.    Alturnamats' goodwill, reputation, and standing in the business community will be injured;

d.    The confidentiality and proprietary nature of Alturnamats' Confidential Information will be destroyed and/or seriously impaired;

e.    Alturnamats will lose the competitive advantage afforded by its Confidential Information;

f.    Alturnamats will lose the benefit of its investment of time, money, and other resources in compiling and developing such Confidential Information;

g.    Alturnamats' employees will suffer the loss of morale by virtue of the loss of its existing customer base.

WHEREFORE, Alturnamats requests that this Court grant it equitable and other relief, and enter judgment:

a.    Preliminarily enjoining and restraining, and, after a final hearing, permanently enjoining and restraining, Signature from:

(i)    Employment of Harry;

(ii)     Developing and/or marketing any product that in any way utilizes or relies upon Alturnamats' Confidential Information;

(iii)    Selling to any actual or prospective customers of Alturnamats;

(iv)     Contacting and/or communicating with any and all dealers, distributors, and/or customers of Alturnamats for the purpose of soliciting, inducing, encouraging, or otherwise persuading such dealers, distributors or customers to distribute, sell, and/or purchase from Signature; and

(v)      Appropriating, disclosing, taking advantage of, or using in any other manner whatsoever Alturnamats' Confidential Information or any other property belonging to Alturnamats.

b.      Directing Signature to return to Alturnamats any of Alturnamats' property in its possession, custody or control, as well as any other documents that contain, reflect, refer, or relate in any way to Alturnamats' Confidential Information, in whole or in part;

c.      Against Signature for compensatory damages in such amount as shall be determined at trial that Alturnamats has sustained as a consequence of Signature's conduct;

d.      For such other relief as this Court may deem appropriate.

## COUNT VII

## MISAPPROPRIATION OF TRADE SECRETS

## ALTURNAMATS, INC. v. DEFENDANTS

107.    Paragraphs 1 through 106 of this Complaint are hereby incorporated by reference as though the same were fully set forth herein.

108.    By virtue of a relationship of trust and confidence and the common law obligations that existed between Harry and Alturnamats, and as consideration for his agreeing to

the Confidentiality Obligations imposed by the Employee Handbook and Acknowledgement and Agreement, Harry was provided with access to the Confidential Information.

109.    As a consequence of the Sales Agreement and in connection with its position as Alturnamats' dealer and distributor, Signature was provided with and maintained and possessed Alturnamats' Confidential Information.

110.    The Confidential Information was obtained and/or developed by Alturnamats at great expense and is not generally available to Alturnamats' competitors. Alturnamats derives value from the Confidential Information by virtue of the fact that it is not generally known.

111.    Alturnamats takes reasonable steps to ensure that the Confidential Information remains confidential and is not disclosed to Alturnamats' competitors or to the general public.

112.    Upon information and belief, Harry has used and/or disclosed the Confidential Information in violation of the Confidentiality Obligations.

113.    Upon information and belief, Signature has used and/or disclosed Confidential Information in violation of the Sales Agreement.

114.    Upon information and belief, Harry has disclosed the Confidential Information to Signature, and Harry and Signature have utilized the Confidential Information knowing it was obtained through wrongful means.

115.    The wrongful disclosure and/or use of the Confidential Information, if it has not occurred already, is inevitable given the similarity between Signature's products and Alturnamats' products, as well as the fact that Harry and/or Signature are soliciting the same customers and/or dealers Harry called upon while employed by Alturnamats.

116.   The actions and conduct of Defendants were intentional, malicious and sufficiently outrageous to justify an award of punitive damages.

117.   As a direct and proximate result of the Defendants' misappropriation of trade secrets, Defendants are jointly and severally liable to Plaintiffs for damages, plus punitive damages, interest thereon at the highest rate allowed by law, court costs and attorneys' fees.

118.   As a direct and proximate result of the Defendants' misappropriation of the Confidential Information, Alturnamats has suffered and will suffer substantial damages, including but not limited to the impairment or destruction of the Confidential Information, loss of goodwill and dealer, distributor and/or customer relationships and lost profits.

119.   The threatened and/or actual injuries that Alturnamats has suffered and/or will suffer are immediate and irreparable. Because of the difficulty in quantifying injury and harm to Alturnamats' ability to compete and to maintain a competitive advantage through its Confidential Information and valuable customer and prospective customer relations, as well as the harm resulting from the Defendants' wrongful possession and use of the Confidential Information, monetary damages alone will not fully compensate Alturnamats for the Defendants' wrongful conduct. Alturnamats therefore lacks an adequate and complete remedy at law.

120.   As a direct and proximate result of Defendants' conduct alleged herein, Alturnamats is in imminent danger of suffering irreparable harm in the following respects:

   a.   Alturnamats will lose valuable relationships with its dealers, distributors, customers and prospective customers;

   b.   Alturnamats will lose valuable contracts, sale opportunities, orders, and profits;

   c.   Alturnamats' goodwill, reputation, and standing in the business community will be injured;

d.    The confidentiality and proprietary nature of Alturnamats' Confidential Information will be destroyed and/or seriously impaired;

e.    Alturnamats will lose the competitive advantage afforded by its Confidential Information;

f.    Alturnamats will lose the benefit of its investment of time, money, and other resources in compiling and developing such Confidential Information;

g.    Alturnamats' employees will suffer the loss of morale by virtue of the loss of its existing customer base.

WHEREFORE, Alturnamats requests that this Court grant it equitable and other relief, and enter judgment:

a.    Preliminarily enjoining and restraining, and, after a final hearing, permanently enjoining and restraining:

    (i)    Harry from employment with Signature;

    (ii)    Signature from selling to any actual or prospective client of Alturnamats;

    (iii)    Defendants from developing and/or marketing any product that in any way utilizes or relies upon Alturnamats' Confidential Information;

    (iv)    Defendants from contacting and/or communicating with any and all dealers, distributors, and/or customers he serviced while employed by Alturnamats for the purpose of soliciting, inducing, encouraging, or otherwise persuading such dealers, distributors or customers to distribute, sell, and/or purchase from Signature; and

    (v)    Defendants from appropriating, disclosing, taking advantage of, or using in any other manner whatsoever Alturnamats' Confidential Information or any other property belonging to Alturnamats.

b.    Directing Defendants to return to Alturnamats any of Alturnamats' property in his possession, custody or control, as well as any other documents that contain, reflect, refer, or relate in any way to Alturnamats' Confidential Information, in whole or in part;

c.  Against Defendants for compensatory damages in such amount as shall be determined at trial that Alturnamats has sustained as a consequence of Defendants' conduct;

d.  Awarding Punitive Damages;

e.  Awarding such other relief as this Court may deem appropriate.

## COUNT VIII

### INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS ALTURNAMATS, INC. v. SIGNATURE

121.  Paragraphs 1 through 120 of this Complaint are hereby incorporated by reference as though the same were fully set forth herein.

122.  A valid contract existed between Alturnamats and Harry.

123.  Signature knew or should have known of the existence of Harry's Confidentiality Obligations to Alturnamats at the time it hired Harry.

124.  Signature has induced Harry to breach his Confidentiality Obligations to Alturnamats.

125.  Signature acted without legal justification, defense, or excuse.

126.  Signature's conduct resulted in actual damages to Alturnamats.

127.  The actions and conduct of Signature were intentional, malicious and sufficiently outrageous to justify an award of punitive damages.

128.  As a direct and proximate result of the Defendants' tortious interference with existing and prospective contracts, Defendants are jointly and severally liable to Plaintiffs for damages, plus punitive damages, interest thereon at the highest rate allowed by law, court costs and attorneys' fees.

129. The threatened and/or actual injuries that Alturnamats has suffered and/or will suffer are immediate and irreparable. Because of the difficulty in quantifying injury and harm to Alturnamats' ability to compete and to maintain a competitive advantage through its Confidential Information and valuable customer and prospective customer relations, as well as the harm resulting from the Defendants' intentional interference with contractual relations, monetary damages alone will not fully compensate Alturnamats for the Defendants' wrongful conduct. Alturnamats therefore lacks an adequate and complete remedy at law.

130. As a direct and proximate result of Defendants' conduct alleged herein, Alturnamats is in imminent danger of suffering irreparable harm in the following respects:

    a.    Alturnamats will lose valuable relationships with its dealers, distributors, customers and prospective customers;

    b.    Alturnamats will lose valuable contracts, sale opportunities, orders, and profits;

    c.    Alturnamats' goodwill, reputation, and standing in the business community will be injured;

    d.    The confidentiality and proprietary nature of Alturnamats' Confidential Information will be destroyed and/or seriously impaired;

    e.    Alturnamats will lose the competitive advantage afforded by its Confidential Information;

    f.    Alturnamats will lose the benefit of its investment of time, money, and other resources in compiling and developing such Confidential Information;

    g.    Alturnamats' employees will suffer the loss of morale by virtue of the loss of its existing customer base.

WHEREFORE, Alturnamats requests that this Court grant it equitable and other relief, and enter an order:

a. Preliminarily enjoining and restraining, and, after a final hearing, permanently enjoining and restraining:

    (i) Harry from employment with Signature;

    (ii) Signature from selling to any actual or prospective client of Alturnamats;

    (iii) Defendants from developing and/or marketing any product that in any way utilizes or relies upon Alturnamats' Confidential Information;

    (iv) Defendants from contacting and/or communicating with any and all dealers, distributors, and/or customers he serviced while employed by Alturnamats for the purpose of soliciting, inducing, encouraging, or otherwise persuading such dealers, distributors or customers to distribute, sell, and/or purchase from Signature; and

    (v) Defendants from appropriating, disclosing, taking advantage of, or using in any other manner whatsoever Alturnamats' Confidential Information or any other property belonging to Alturnamats.

b. Directing Defendants to return to Alturnamats any of Alturnamats' property in his possession, custody or control, as well as any other documents that contain, reflect, refer, or relate in any way to Alturnamats' Confidential Information, in whole or in part;

c. Against Defendants for compensatory damages in such amount as shall be determined at trial that Alturnamats has sustained as a consequence of Defendants' conduct;

d. Awarding Punitive Damages;

e. Awarding such other relief as this Court may deem appropriate.

## COUNT IX

## INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGES

## ALTURNAMATS, INC. v. DEFENDANTS

131.    Paragraphs 1 through 130 of this Complaint are hereby incorporated by reference as though the same were fully set forth herein.

132.    Defendants have acted and continue to act with the intent and for the purpose of harming Alturnamats and destroying Alturnamats' business by attempting to interfere, interfering with, and disrupting Alturnamats' contractual relations with its customers and prospective customers.

133.    Defendants have no right or privilege to interfere with Alturnamats' present or prospective contractual relations.

134.    Defendants' actions were intentional, malicious and outrageous to justify an award of punitive damages.

135.    As a direct result of Defendants' intentional and tortious interference with Alturnamats' existing contractual relations and their attempts to disrupt and interfere with Alturnamats' prospective contractual relations, Alturnamats has suffered and will suffer substantial damages, including but not limited to loss of dealers, loss of customers, profits and good will.

136.    The actions and conduct of Signature were intentional, malicious and sufficiently outrageous to justify an award of punitive damages.

137.    As a direct and proximate result of the Defendants' tortious interference with existing and prospective contracts, Defendants are jointly and severally liable to Plaintiffs for

damages, plus punitive damages, interest thereon at the highest rate allowed by law, court costs and attorneys' fees.

138. Further, the threatened and/or actual injuries that Alturnamats has suffered and/or will suffer are immediate and irreparable. Because of the difficulty in quantifying injury and harm to Alturnamats' ability to compete and to maintain a competitive advantage through its Confidential Information and valuable customer and prospective customer relations, as well as the harm resulting from the Defendants' wrongful possession and use of the Confidential Information, monetary damages alone will not fully compensate Alturnamats for the Defendants' wrongful conduct. Alturnamats therefore lacks an adequate and complete remedy at law.

139. As a direct and proximate result of Defendants' conduct alleged herein, Alturnamats is in imminent danger of suffering irreparable harm in the following respects:

    a.    Alturnamats will lose valuable relationships with its dealers, distributors, customers and prospective customers;

    b.    Alturnamats will lose valuable contracts, sale opportunities, orders, and profits;

    c.    Alturnamats' goodwill, reputation, and standing in the business community will be injured;

    d.    The confidentiality and proprietary nature of Alturnamats' Confidential Information will be destroyed and/or seriously impaired;

    e.    Alturnamats will lose the competitive advantage afforded by its Confidential Information;

    f.    Alturnamats will lose the benefit of its investment of time, money, and other resources in compiling and developing such Confidential Information;

    g.    Alturnamats' employees will suffer the loss of morale by virtue of the loss of its existing customer base.

WHEREFORE, Alturnamats requests that this Court grant it equitable and other relief, and enter an order:

a.   Directing Defendants to return to Alturnamats any of Alturnamats' property in his possession, custody or control, as well as any other documents that contain, reflect, refer, or relate in any way to Alturnamats' Confidential Information, in whole or in part;

b.   Preliminarily enjoining and restraining, and, after a final hearing, permanently enjoining and restraining:

  (i)    Harry from employment with Signature; and

  (ii)   Defendants from developing and/or marketing any product that in any way utilizes or relies upon Alturnamats' Confidential Information;

  (iii)  Defendants from contacting and/or communicating with any and all dealers, distributors, and/or customers he serviced while employed by Alturnamats for the purpose of soliciting, inducing, encouraging, or otherwise persuading such dealers, distributors or customers to distribute, sell, and/or purchase from Signature; and

  (iv)   Defendants from appropriating, disclosing, taking advantage of, or using in any other manner whatsoever Alturnamats' Confidential Information or any other property belonging to Alturnamats.

c.   Against Defendants for compensatory damages in such amount as shall be determined at trial that Alturnamats has sustained as a consequence of Defendants' conduct;

d.   Awarding punitive damages;

e.   Awarding such other relief as this Court may deem appropriate.

## COUNT X

### CIVIL CONSPIRACY

### ALTURNAMATS, INC. v. DEFENDANTS

140.   Paragraphs 1 through 139 are incorporated by reference as fully set forth herein.

141. On information and belief, as alleged above, Harry breached his Confidentiality Obligations and duty of loyalty to Alturnamats.

142. On information and belief, Signature, through its agents and representatives, had knowledge of and unlawfully used the trade secrets and confidential information of Alturnamats and had knowledge of the trade secret and confidential nature thereof.

143. By engaging in the conduct described herein, Defendants intentionally and willfully entered into an agreement and conspiracy with the intent to breach Harry's Confidentiality Obligations and duty of loyalty to Alturnamats, to tortiously interfere with Alturnamats' business relationships and prospective business advantages and to misappropriate Alturnamats' trade secrets and confidential information to develop and advance their own business interests and to harm the business interests of Alturnamats in violation of Pennsylvania law.

144. In furtherance of their conspiracy, Defendants gained access to and used for their own benefit trade secrets and other valuable proprietary and confidential business information and belonging to Alturnamats and used such information to compete unfairly with Alturnamats.

145. On information and belief, in furtherance of their conspiracy, Harry, while still in the employ of Alturnamats, misappropriated Alturnamats' confidential information and trade secrets and has used and disclosed such information for the benefit of Defendants in order to compete unfairly with Alturnamats and to unlawfully interfere with Alturnamats' existing and prospective contractual relations.

146. At all times, Defendants sought to and did successfully conceal from Alturnamats their improper competitive activities and conspiracy.

147. As a direct result of Defendants' unlawful civil conspiracy, Alturnamats has suffered and will continue to suffer injuries to its business, property and reputation.

148. Defendants' actions were intentional, malicious and outrageous to justify an award of punitive damages.

149. As a direct and proximate result of the Defendants' conspiracy, Alturnamats has suffered and will suffer substantial damages, including but not limited to the impairment or destruction of the Confidential Information, loss of goodwill and dealer, distributor and/or customer relationships and lost profits.

150. As a direct and proximate result of the Defendants' tortious interference with existing and prospective contracts, Defendants are jointly and severally liable to Plaintiffs for damages, plus punitive damages, interest thereon at the highest rate allowed by law, court costs and attorneys' fees.

151. The threatened and/or actual injuries that Alturnamats has suffered and/or will suffer are immediate and irreparable. Because of the difficulty in quantifying injury and harm to Alturnamats' ability to compete and to maintain a competitive advantage through its Confidential Information and valuable customer and prospective customer relations, as well as the harm resulting from the Defendants' wrongful possession and use of the Confidential Information, monetary damages alone will not fully compensate Alturnamats for the Defendants' wrongful conduct. Alturnamats therefore lacks an adequate and complete remedy at law.

152. As a direct and proximate result of Defendants' conduct alleged herein, Alturnamats is in imminent danger of suffering irreparable harm in the following respects:

   a. Alturnamats will lose valuable relationships with its dealers, distributors, customers and prospective customers;

b.   Alturnamats will lose valuable contracts, sale opportunities, orders, and profits;

c.   Alturnamats' goodwill, reputation, and standing in the business community will be injured;

d.   The confidentiality and proprietary nature of Alturnamats' Confidential Information will be destroyed and/or seriously impaired;

e.   Alturnamats will lose the competitive advantage afforded by its Confidential Information;

f.   Alturnamats will lose the benefit of its investment of time, money, and other resources in compiling and developing such Confidential Information;

g.   Alturnamats' employees will suffer the loss of morale by virtue of the loss of its existing customer base.

WHEREFORE, Alturnamats requests that this Court grant it equitable and other relief, and enter judgment:

a.   Preliminarily enjoining and restraining, and, after a final hearing, permanently enjoining and restraining:

(i)   Harry from employment with Signature; and

(ii)   Defendants from developing and/or marketing any product that in any way utilizes or relies upon Alturnamats' Confidential Information;

(iii)   Defendants from contacting and/or communicating with any and all dealers, distributors, and/or customers he serviced while employed by Alturnamats for the purpose of soliciting, inducing, encouraging, or otherwise persuading such dealers, distributors or customers to distribute, sell, and/or purchase from Signature; and

(iv)   Defendants from appropriating, disclosing, taking advantage of, or using in any other manner whatsoever Alturnamats' Confidential Information or any other property belonging to Alturnamats.

b.  Directing Defendants to return to Alturnamats any of Alturnamats' property in his possession, custody or control, as well as any other documents that contain, reflect, refer, or relate in any way to Alturnamats' Confidential Information, in whole or in part;

c.  Against Defendants for compensatory damages in such amount as shall be determined at trial that Alturnamats has sustained as a consequence of Defendants' conduct;

d.  Awarding punitive damages;

e.  Awarding such other relief as this Court may deem appropriate.

**<u>JURY TRIAL DEMANDED</u>**.

Respectfully submitted,

MEYER, UNKOVIC & SCOTT LLP

By: /s/ David Oberdick
      David Oberdick
      Pa. I.D. 47648
      Ronald L. Hicks
      Pa. I.D. No. 49520
      Quinn A. Johnson
      Pa. I.D. No. 91161
      Meyer, Unkovic & Scott LLP
      1300 Oliver Building
      535 Smithfield Street
      Pittsburgh, PA  15222
      (412) 456-2800

      ATTORNEYS FOR PLAINTIFF

709642.1

## **VERIFICATION**

I, Paul A. Gierlach, Jr., Vice-President of Alturnamats, Inc., state that I have read the foregoing Complaint and verify that I am authorized to make this Verification on behalf of Alturnamats, Inc., and that the averments made are true and correct of my own knowledge, except as to those things stated upon information and belief, and as to those I believe to be true.

This statement is made subject to the penalties of 18 Pa.C.S.A. 4904, relating to unsworn falsification to authorities.

Date: December 6, 2007