# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ALTURNAMATS, INC., a Pennsylvania )
Corporation, )
      )
      )
         Plaintiff, )
       v. )      C.A. No. 07-337 Erie
      )      Judge McLaughlin
GERALD HARRY, an individual, and )
SIGNATURE FENCING AND FLOORING )
SYSTEMS, LLC (a/k/a SIGNATURE )
SYSTEMS, LLC) t/d/b/a DURADECK, a )
Delaware Corporation, )
      )
         Defendants. )


## MEMORANDUM OPINION

McLAUGHLIN, SEAN J., J.

On December 6, 2007, Plaintiff Alturnamats, Inc. ("Alturnamats") filed a Motion for Temporary Restraining Order and/or Preliminary Injunction ("the Motion") seeking injunctive and other equitable relief against Defendants Gerald Harry ("Harry") and Signature Fencing and Flooring Systems, LLC ("Signature") for alleged misappropriation of trade secrets, breach of contract, breach of duty of loyalty, intentional interference with contractual relations and intentional interference with prospective economic advantages. An evidentiary hearing on the claims set forth in the Motion was held on March 5th, 6th, 7th and 10th, 2008. The parties subsequently agreed that, pursuant to Federal Rule of Civil Procedure 65(a)(2), the preliminary injunction hearing would be converted to a final hearing on the merits. The following constitute the Court's Findings of Fact and Conclusions of Law.


## FINDINGS OF FACT

### A) Background

1.	Alturnamats is a Pennsylvania corporation with its principal place of business at 701 East Spring Street, Building 63, Titusville, Venango County, Pennsylvania, 16354. (3/5/08 Hearing Transcript (hereinafter "3/5/08 H. T."), pp. 34-36). Alturnamats was founded in 1993 by Jim Aaron and his wife Janet Aaron. (3/6/08 H.T., p. 6).

2.	Signature is a Delaware corporation with its principal place of business at 50 E 42nd St., Suite 501, New York, New York 10017. (3/5/08 H.T., p. 30). Signature sells a number of ground protection products including portable roadway systems, the latter being part of their product line since 2004. (3/7/08 H.T., p. 72).

3.	Signature's President, Arnon Rosan, has been active in the sales of ground protection and modular flooring since 1993. (3/7/08 H.T., p. 72).

4.	Gerald Harry is an adult individual residing at 21 Glenwood Drive, Oil City, Pennsylvania 16301 and is an employee or agent of Signature. (3/5/08 H.T., p. 30).

5.	In June, 2006, Jim and Janet Aaron sold Alturnamats to current owners Paul and Vennie Gierlach and their son, Michael Gierlach. Michael Gierlach also serves as the President of Alturnamats. (3/5/08 H.T., p. 34).

6.	Alturnamats is in the business of manufacturing and providing interlocking portable flooring systems and roadways for turf and landscaped area protection and to provide traction for vehicles operating in mud or sand. (3/5/08 H.T., p. 36).

7.	Alturnamats primarily markets and sells its products to dealers and distributors who, in turn, sell the products to "end users." "End users" purchase the ground protection mats to use in the field, rather than to resell, and constitute a very small percentage of Alturnamats' customers. Alturnamats also sells to "original equipment manufacturers," or "OEMs." An OEM, typically a manufacturer of a piece of heavy equipment or machinery, purchase the portable ground protection systems to package and market in conjunction with their own machinery. An OEM is generally considered a dealer but is handled differently with respect to certain agreements and pricing. (3/5/08 H.T., pp. 45-46).

8.      Alturnamats manufactures and sells the following products:

a.      "AlturnaMATS" is a ground protection mat that features a maximum traction diamond plate tread design and is ideal for rugged application where maximum traction is desired.  AlturnaMATS come in a variety of sizes generally 4' x 8' and 3' x 8' and generally in black and white colors.

b.      "VersaMATS" is a ground protection mat that features a flat tread design on one side and the diamond plate tread design on the reverse side and is ideal for both pedestrian and vehicular traffic.  VersaMATS come in a variety of sizes generally 4' x 8' and 3' x 8' and generally in black and white colors.

c.      "Turn-A-Links" are either single or double links used to lock AlturnaMATS and VersaMATS together to form a continuous roadway, walkway, or working platform.  Turn-A-Links come in either round links or flat links.

d.      "Handi-Hooks" are tools that make moving the AlturnaMATS and VersaMATS easy, even in wet areas.

e.      "Outrigger Pads" are lightweight 4-ply construction pads used to protect the ground from heavy equipment such as cranes.

f.      "MAT-PAK" is a combined package consisting of twelve (12) AlturnaMATS or VersaMATS, twenty (20) Turn-A-Links, two (2) Handi-Hooks and a metal storage, skid rack. (3/5/08 H.T., pp. 38-43; *See* Plaintiff's Hrg. Ex. "1").

9.      AlturnaMATS and VersaMATS have a variety of applications including, but not limited to, drilling, utilities, tree care/arborists, landscaping, construction, cemeteries, golf courses, manufactured housing, and the military.  (3/5/08 H.T., p. 43).

**B) Gerald Harry's employment at Alturnamats**

10.     Between 1993 and 1999, the Aarons built a customer base of approximately 40 dealers by frequenting trade shows, making cold call solicitations, and advertising in trade publications and other magazines. (3/6/08 H.T., p. 6-7).

11.     Harry commenced his employment with Alturnamats on January 1, 2000. During his tenure, he held the position of National Sales Representative/Manager. (3/5/08 H.T., pp. 30 & 94). In this capacity, Harry had a myriad of duties including managing the sales of the company, dealer recruitment, dealer setup, end-user recruitment, end-user setup, account maintenance; development of dealer prices; development of tradeshow schedules, and customer service for the domestic United States. (3/5/08 H.T., pp. 94-96; 3/6/08 H.T., pp. 25-36).

12.     Although Harry had no prior experience in the portable mat industry, Aaron hired him based on his prior sales experience and his previous work with a small family owned business. (3/6/08 H.T., p. 10).

13.     Throughout Harry's employment, Alturnamats Managment took steps to facilitate Harry's efforts to grow the business. As an initial matter, Aaron escorted Harry to trade shows, introduced him to customers, and generally tutored him as to the ins and outs of the business. (3/6/08 H.T., pp. 12-13). Harry was also given access to the Alturnamats' QuickBook program, a computer program from which Harry could run customer and sales reports, as well as access information about bidding and pricing structure and marketing plans. (3/5/08 H.T., pp. 104-08).

14.     In addition, Harry was provided with daytimers and a laptop computer, with access to the Outlook program, in order for Harry to manage dealer and end-user contact information. (3/5/08 H.T., p. 104).

15.     Finally, Harry was provided with dealer lists containing contact information that Harry placed inside his daytimers. (3/5/08 H.T., p. 106).

16.     With Alturnamats' assistance, Harry "hit the ground running" and after one year of employment, Alturnamats had increased its number of dealers to 63. After Harry's second year of employment, that number rose to 84. (3/5/08 H.T., p. 98). By November, 2007, as

a result of Harry's efforts and the support of Alturnamats management, the customer base had increased to approximately 170 dealers or OEMs. (3/5/08 H.T., pp. 46-47, 51).

17.   Harry was well compensated by Alturnamats for his sales efforts as an incentive to continued good performance and as a disincentive for him to seek alternate employment. (3/6/08 H.T., pp. 36-38).

18.   Subsequent to his acquisition of the company, Gierlach worked to develop an Employee Handbook for Alturnamats employees. On April 20, 2007, Harry signed an "Acknowledgment and Agreement" ("Acknowledgment and Agreement") acknowledging that he had reviewed and received the Alturnamats' Employee Handbook and agreed to the policies and confidentiality obligations contained therein. (3/5/08 H.T., pp. 30 & 72; See Plaintiffs Hrg. Ex. "13").

19.   Specifically, Paragraph M of Section V of the Alturnamats' Employee Handbook provides as follows:

M. CONFIDENTIALITY

**Information about the Company [defined as Alturnamats], . . .its Employees, customers, suppliers, and vendors is to be kept confidential and divulged only to individuals within the Company with both a need to receive and authorization to receive the information**. If in doubt as to whether information should be divulged, err in favor of not divulging information and discuss the situation with your Supervisor.

**All records and files maintained by the Company . . . are confidential and remain the property of the Company. . . . Records and files are not to be disclosed to any outside party without the express permission of the President of the Company**. . . . Confidential information includes, but is in no way limited to: financial records, business, marketing, and strategic plans, personnel and payroll records regarding current and former Employees, **the identity of, contact information for, and any other account information on customers, vendors, and suppliers**, inventions, programs, trade secrets, formulas, techniques, and processes, and any other documents or information regarding the Company's operations, procedures, or practices. **Confidential information may not be removed from Company premises without express authorization.**

**Confidential information obtained during or through employment with the Company may not be used by any Employee for the purpose of furthering current or future outside employment or activities or for obtaining personal gain or profit.** The Company . . . reserve[s] the right to avail itself of all legal or

equitable remedies to prevent impermissible use of confidential information or to recover damages incurred as a result of the impermissible use of confidential information.

(See Plaintiff's Hrg. Ex. "12," Bates Stamp p. 00023-34 (emphasis added)).

20. Sub-paragraph 3 of Paragraph D of Section VI of Alturnamats' Employee Handbook provides that the "Company's computer, voicemail, electronic mail (e-mail), or telephone systems and the data stored on them are and remain at all times the property of the Company." (See Plaintiff's Hrg. Ex. "12," Bates Stamp p. 00030).

21. Paragraph 8 of Section VIII of Alturnamats' Employee Handbook provides that if an employee decides to voluntarily leave employment, then "at least two weeks written notice" is required in order to "give [Alturnamats] the opportunity to make the necessary adjustments in its operations." An employee was also required "to return all property owned by the Company (e.g., vehicles, computers, keys, uniforms, identification badges, credit cards) prior to [the employee's] departure." (See Plaintiff's Hrg. Ex. "12," Bates Stamp p. 00041).

22. Alturnamats reserved the right to "change, delete, suspend or discontinue delete any part or parts of the policies in [the] Employee Handbook at any time without prior notice." (3/5/08 H.T., p. 226; See Plaintiff's Hrg. Ex. "12," Bates Stamp pp. 00006-00007).

23. The Employee Handbook included a disclaimer that "[t]he policies contained herein do not create any employment or personal contract, express or implied." (See Plaintiff's Hrg. Ex. "12," Bates Stamp pp. 00006). Gierlach testified, and we so find, that the Employee Handbook was not intended to create an employment contract. (3/5/08 H.T., p. 225).

## C) Alturnamats' confidential information

24. The evidence reveals that Alturnamats made substantial efforts to maintain the secrecy and confidentiality of its customer list.

25. For instance, Alturnamats restricted access to customer lists and dealer information to employees within the company on a need-to-know basis. The information was stored on password protected computers which limited access to key employees. This information was primarily stored on two computer programs: the QuickBooks and Outlook programs. The

information contained in Alturnamats' QuickBooks program was only accessible through a second username and password and then only on a "need to know" basis. (3/5/08 H.T., pp. 55-65).

26. Additionally, Alturnamats' dealers were also advised as to the sensitive, proprietary, and confidential nature of this information and agreed pursuant to contracts to keep such information confidential. Specifically, Paragraph 7 of Alturnamats' standard Sales Agreement contained the following language:

> ***The Dealer agrees not to disclose to any person, or use in any way, any confidential information of Alturnamats, Inc. for the duration of this agreement and for a period of ten (10) years following the termination of this agreement.*** This does not apply to information made public through no fault of the Dealer or that exists in the public domain. ***The term 'Confidential Information' used herein shall include all data, quotations, specifications, designs, plans, knowledge and other technical or business information, whether reduced to writing or not, or whether disclosed by inspection of Alturnamats, Inc. facilities or documents, or by conversation with Alturnamats, Inc. employees and whether reduced to practice or not by Alturnamats, Inc.***

(3/5/08 H.T., pp. 91-93; *See* Plaintiff's Hrg. Ex. "24," Bates Stamp p. 00157 (emphasis added)).

27. We credit the testimony of Aaron and Gierlach that the customer list is the most sensitive, proprietary and valuable property owned by Alturnamats. (3/6/08 H.T., pp. 18; 3/5/08 H.T. p. 120).

28. Although Alturnamats also contends that their price list and volume discount incentives were confidential and proprietary, Signature already had access to this information by virtue of their position as an Alturnamats dealer. (3/5/08 H.T., pp. 137-38)


### D) Alturnamats' relationship with Signature

29. On February 28, 2005, Alturnamats and Signature entered into a Sales Agreement ("Sales Agreement") pursuant to which Alturnamats appointed Signature as an independent Dealer of Alturnamats' products. (3/5/08 H.T., p. 31; See Plaintiff's Hrg. Ex. "24," Bates Stamp p. 00156).

30.     Pursuant to Paragraph 7 of the Sales Agreement, entitled "Covenants Against Disclosure and Competition" and quoted above, Signature agreed to the non-disclosure and non-use of Alturnamats' Confidential Information.  (See Plaintiff's Hrg. Ex. "24," Bates Stamp p. 00157).

31.     After signing the Sales Agreement, Signature was provided access to certain information by Alturnamats including dealer price lists, sales manuals, lists of potentially productive trade shows to attend, and end-user contacts for Signature's region.  (3/5/08 H.T., pp. 137-38).

32.     Every dealer, including Signature, could utilize an Alturnamats assigned username and password to access a dealer-specific "Dealer Area" of the Alturnamats website (www.alturnamats.com).  Dealers with access to this area were provided access to a variety of information, including but not limited to, Alturnamats' current dealer price list and a list of sales leads based on inquiries received by Alturnamats for end-users within the dealer's region.  The information regarding those sales leads included contact information such as the company name, individual contact person, address, telephone and fax numbers.  (3/5/08 H.T., pp. 87-90; See Plaintiff's Hrg. Ex. "10").

33.     Subsequent to execution of the Sales Agreement, Signature, with the permission of Alturnamats, distributed the Alturnamats products under the tradename "DuraDeck." (3/5/08 H.T., pp. 31, 139-141; See Plaintiff's Hrg. Ex. "154").

34.     On April 12, 2007, Signature received a proposal from a company called LRM Industries ("LRM") to manufacture similar portable ground protection products to those manufactured by Alturnamats. (3/6/08 H.T., pp. 206-08; 3/10/08 A.M. Hearing Transcript (hereinafter "3/10/08 A.M. H.T."), pp. 10-11; See Plaintiff's Hrg. Ex. No. "27").

35.     On or about July 9, 2007, Signature accepted the LRM proposal and issued a blanket purchase order to LRM to manufacture various quantities of a portable ground protection product to be rebranded by Signature as DuraDeck. (3/6/08 H.T., pp. 213-14; See Plaintiff's Hrg. Ex. "28").

## E)  The courtship of Harry by Signature

36.     Between July, 2007, and August, 2007, Rosan approached Harry on at least three occasions relative to potential employment as a sales representative with Signature.  (3/6/08 H.T., pp. 46-49).  Rosan testified, and we so find, that Signature was interested in hiring Harry because he was a gifted salesman with a charismatic and likeable personality who formed positive relationships quickly with potential clients in the ground protection mat industry.  (3/7/08 H.T., pp. 132-135).  Rosan testified that everyone in the industry knew and liked Harry, and that his "old school" style of selling resonated with customers.  (3/7/08 H.T., pp. 134-135).

37.     On September 27 and 28, 2007, Harry met with Rosan and several other Signature officers and employees at Signature's New York City office concerning his prospective employment.  (3/6/08 H.T., p. 59).  At the conclusion of the meeting, Harry was informed he would be receiving an offer of employment. (3/6/08 H. T., p. 68).

38.     On Thursday, November 1, 2007, Harry executed the Employment Agreement with Signature and resigned from Alturnamats the following day. (3/6/08 H.T., pp. 92-93; See Plaintiffs Hrg. Ex. "48").

39.     The testimony at the hearing revealed that Harry took the following items with him when he left Alturnamats:  a rolodex/box of business cards that he had accumulated while an employee of Alturnamats; daytimers/calendars that had been purchased and provided to him by Alturnamats; a type-written list of names and emails addresses for the then existing dealers/end-users of Alturnamats; a printed list of all of the contacts in the Outlook program maintained on the laptop provided to him by Alturnamats; and a report generated from Alturnamats' QuickBooks program that identified customer names, addresses, contact persons, and telephone and fax numbers. (3/5/08 H.T., pp. 109-33; See Plaintiffs Hrg. Ex. "52," "53," "54," "55," "56," "57," "58," & "59").

40.     The daytimers and planners taken by Harry contained additional handwritten information and notes relative to such information as company names, websites, contact persons, cell phone numbers, optimum times to call or contact the company, price history and information for a particular dealer, and other personal information useful to Harry in his position as

Alturnamats Sales Manager.  (3/5/08 H.T., pp. 109-114; See Plaintiffs Hrg. Ex. "52," "53," "54," and "55").

**F)  Signature's utilization of the appropriated customer lists**

41.     Signature maintains a list of potential customers in two separate computer program databases called ACT and ACCESS.  (3/6/08 H.T., p. 113).  The ACCESS database contains approximately 440,000 names of potential sales contacts or leads, and the ACT database contains approximately 67,000 names.  (3/7/08 H.T., pp. 203-05).

42.     Harry's Alturnamats Outlook address book and a handwritten list of prospective customers that Harry prepared based upon the clients he acquired while at Alturnamats were entered into the ACT database.  (3/7/08 H.T., pp. 141-42).

43.     Harry also provided Signature with a hard copy of the Alturnamats Quickbook customer list, but we find that it had not been utilized by Signature for any purpose as of the date of the hearing.  (3/6/08 H.T., p. 110; 3/7/08 H.T., p. 136).

44.     Signature sent an announcement e-mail to 86 recipients regarding Gerald Harry's arrival on November 29, 2007.  (3/6/08 H.T., p. 146; Def. Ex. 31).

45.     The announcement e-mail and one hard copy mailing (made to 77 recipients) were the only mailings made from Harry's contact information from Alturnamats.  The hard copy mailing contained the same text as the e-mail and included a brochure.  (3/7/08 H.T., p. 143; Def. Ex. 30).

46.     As of the date of the hearing, Signature had not made any sales to any of Harry's former customers who were recipients of the e-mail or hard copy mailings.  (3/10/08 H.T. A.M., p. 69).

47.     Pending the results of this litigation, the ACT entries made from Gerald Harry's contact information have been coded into Signature's database as "Gerald Harry Do Not Touch" and designated for deletion following the conclusion of this lawsuit.  (3/7/08 H.T., p. 143).

48. After the commencement of this litigation, a Signature employee, Audra Cohen, performed a comparison whereby she searched for the names of the Alturnamats dealers appearing on the lists provided by Harry within the Signature ACT and ACCESS databases, as well as several other public sources and listings, including trade show listings. (3/10/08 H.T. A.M., pp. 40-46). Cohen was able to identify only 54% of the entities on the Alturnamats dealer lists. (3/10/08 H.T. A.M., pp. 44-46). Moreover, Cohen's search results did not identify any of the entities as **Alturnamats dealers**. (3/10/08 H.T. A.M., pp. 58-61).

### G) Harry's Negotiations with Sandvik

49. In June 2007, Dionna Beckwith ("Beckwith") of Sandvik had contacted Alturnamats, expressing an interest in the AlturnaMATS product. In response to that inquiry, Alturnamats forwarded their main brochure to Beckwith. (Deposition Transcript of Dionna Beckwith (hereinafter "D. Beckwith D.T."), pp. 20-24, incorporated as part of the record at 3/10/08 P.M. H.T., p. 64; See Plaintiffs Hrg. Ex. "105").

50. Thereafter, Harry and Beckwith exchanged several emails relative to creating a color logo design on the Alturnamats product with an eye towards Sandvik becoming an OEM customer. (3/6/08 H.T., pp. 54, 173-74).

51. In September 2007, Alturnamats sent sample mats and outrigger pads to Sandvik for inspection. (D. Beckwith D. T. pp. 95-96).

52. On October 29, 2007, Harry sent a fax to Beckwith which described, *inter alia*, the actual size of the proposed logo that Alturnamats would place on the mats. He also advised Beckwith that he would e-mail her later that day relative to the price for a gray colored mat. (D. Beckwith D.T. pp. 99-100).

53. On October 30, 2007, Harry e-mailed Beckwith with the price for a gray-colored mat and informed her that he would contact her on Friday, November 2, 2007, or Monday, November 6, 2007, to discuss "this information." (3/6/08 H.T. pp. 172-176).

54.  Beckwith responded to Harry's e-mail with the following request: "Do [a proof of the mats] two ways. . . one with logo in four corners and one with logo in four corners and large one in center. Need this for final approval." (3/6/08 H.T., p. 176; D. Beckwith D.T. p.101-103).

55.  Given his resignation from Alturnamats, Harry never responded to Beckwith's e-mail of November 1, 2007. (3/6/08 H.T., pp. 176-77).

56.  After he commenced employment with Signature, but not before, Harry informed Rosan of the potential Sandvik opportunity.  (3/6/08 H.T., pp. 179; 3/7/08 H.T. pp. 149-50).

57.  On November 8, 2007, Rosan sent Sandvik a power point presentation that included pricing information for a customized grey mat containing Sandvik's logo.  Harry's input into the presentation was limited to his knowledge that Sandvik desired a grey mat and the nature of the logo design.  (3/6/08 H.T., p. 179; 3/7/08 H.T., pp. 151-52).

58.  Subsequent to Harry's departure, Sandvik continued to negotiate with both Alturnamats and Signature relative to the production of mats. Ultimately, Sandvik elected to contract with Signature based upon a variety of factors including lower upfront mold costs, freedom to market internationally and the nature of Signature's professional presentation. (D. Beckwith D.T. p. 153).

59.  Rosan testified, and we so find, that in the ground protection industry, the price of the mats is the primary factor that drives sales, rather than quality.  (3/7/08 H.T., pp. 109-110).


## CONCLUSIONS OF LAW

### A)  Standard for Permanent Injunction

A district court deciding whether a permanent injunction should be issued must undertake a three stage inquiry. "First, the court must decide whether plaintiffs have actually succeeded on the merits of their claim. Second, the court must decide whether the "balance of equities" favors the granting of injunctive relief. Finally, the court needs to decide what form the injunctive remedy should take." *Philadelphia Welfare Rights Organization v. O'Bannon*, 525 F.Supp. 1055, 1057

(D.C. Pa.1981); s*ee also Sierra Club v. Alexander*, 484 F.Supp. 455, 471 (N.D.N.Y.), *aff'd*, 633 F.2d 206 (2d Cir. 1980); *Minnesota Public Interest Research Group v. Butz*, 358 F.Supp. 584 (D.Minn.1973), *aff'd*, 498 F.2d 1314 (8th Cir. 1974). Disclosure of confidential and proprietary information, loss or threatened loss of business opportunities, loss or threatened loss of goodwill with existing and prospective customers, loss or threatened loss of market advantage and loss or threatened loss of revenues are all such injuries which are included within the ambit of irreparable harm. *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 195 (3d Cir. 1990) ("Grounds for finding irreparable injury include loss of control of reputation, loss of trade, and loss of good will.")

In Pennsylvania, "a court of equity may fashion a trade secret injunction that is broad enough to ensure that the information is protected." *SI Handling Sys., Inc. v. Heisley*, 753 F.2d 1244, 1265 (3d Cir. 1985)(citing *Air Prod. and Chem., Inc. v. Johnson*, 442 A.2d 1114, 1122-23 (Pa. Super. 1982)). Adequate protection is provided if the injunction lasts long enough to "negate the advantage the misappropriator would otherwise obtain by foregoing independent development." *Id.* at 1266.

### B) Misappropriation of Trade Secrets

A plaintiff is entitled to an injunction to prevent the use and disclosure of a trade secret if: (1) the information constitutes a trade secret; (2) the information has value to its owner and is important in the conduct of the owner's business; (3) by reason of discovery of ownership, plaintiff has a right to use and enjoy the secret; and (4) the secret was communicated to the defendant while in a position of trust and confidence. *SI Handling*, 753 F.2d at 1255; *see also A.M. Skier Agency, Inc. v. Gold*, 747 A.2d 936, 941 (granting injunctive relief to former employer where former employee took confidential customer list to new employer). Moreover, even where there is no indication that a defendant and/or a former employee have benefited from the former employer's trade secret, where an employee is employed in a position that will result in inevitable disclosure of a former employer's trade secrets, then injunction relief may be necessary and appropriate. *Doebler's Pa. Hybrids, Inc. v. Doebler Seeds*, LLC, 88 Fed. Appx. 520, 522-23 (3d Cir. 2004); *Air*

*Prod.*, 442 A.2d at 1124 (noting that injunctive relief was proper because the likelihood of disclosure was high where the duties the former employer had to perform at his new employer would make it impossible for him not to disclose his former employer's trade secrets).

"The concept of a trade secret is at best a nebulous one and has been variously defined by case and text authority." *Van Products Company v. General Welding and Fabricating Company*, 213 A.2d 769, 775 (Pa. 1965). In determining whether information qualifies as a trade secret, we may consider a number of factors, including (1) the extent to which the information is known outside the owner's business, (2) the extent to which it is known by employees and others involved in the owner's business, (3) the extent of measures taken to guard the secrecy of the information, (4) the value of the information to the owner and to his competitors, (5) the amount of effort or money expended by the owner in developing the information, and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *See Mountbatten Surety Co., Inc. v. AFNY, Inc.*, 2000 WL 375259 (E.D. Pa. 2000); *Tyson Metal Prods., Inc. v. McCann*, 546 A.2d 119, 121 (Pa. Super. 1998).

In *Morgan's Home Equipment Corp. v. Martucci*, 136 A.2d 838 (Pa. 1957), the Pennsylvania Supreme Court held that, in certain situations, customer lists could constitute protectable trade secrets:

> In many businesses, permanent and exclusive relationships are established between customers and salesman. The customer lists and customer information which have been compiled by such firms represent a material investment of employer's time and money. This information is highly confidential and constitutes a valuable asset. Such data has been held to be property in the nature of a "trade secret" for which an employer is entitled to protection, independent of a non-disclosure contract . . .

*Morgan's Home Equipment*, 136 A.2d at 842 (footnote omitted); see also *SI Handling Systems, Inc. v. Heisley*, 753 F.2d 1244, 1258 (3d Cir. 1985); *General Business Services, Inc. v. Rouse*, 495 F.Supp. 526, 529-30 (E.D. Pa. 1980). Thus, "[w]here a business has permanent and exclusive relationships between customers and salespersons, and the customer lists compiled by the firm represent a material investment of the firm's time and money, a customer list is in the nature of a

trade secret." *Mountbatten Surety*, 2000 WL 375259, at *15 (citing *A.M. Skier Agency, Inc. v. Gold*, 747 A.2d 936 (Pa. Super. 2000)).

In *Olympic Paper Co. v. Dubin Paper Co.*, a Pennsylvania court denied protection to a customer list after finding no evidence that the plaintiff had "invested time, effort or resources to cultivate its customer list." *Olympic Paper*, 2000 WL 33711064, *9 (Pa. Com. Pl. 2000). As noted above, Harry labored with Aaron and Gierlach to build the Alturnamats customer list over a period of 7 years. The lists improperly taken by Harry were the product of a substantial investment of money, time and labor by Alturnamats. In *Mountbatten*, the court recognized that the protectability of a customer list increases once a company invests substantial time and resources to transform names in trade journals and directories into customers:

> Citing Wayne Price's testimony that in seeking customers AFNY consults and employers, inter alia, trade journals and trade directories . . ., Mountbatten concludes that "anyone could take a look at the [trade directory] and identify a producer in a particular location." We cannot agree that this argument disposes of the claim that the customer list is a trade secret. Wayne Price's testimony that trade journals and trade directories find use in AFNY's marketing only means that these are avenues to start contacts, not that any producer that one happened to telephone would be able to provide the sort of business that AFNY would typically do.

*Mountbatten*, 2000 WL 375259, at *15. The court went on to note that the customer list at issue had been accumulated over a lengthy company history and as a result of significant annual expenditures in advertising dollars and person-hours. *Id*.

In *A.M. Skier v. Gold*, the defendant, a former employee of A.M. Skier Agency, resigned to take a similar position with a competing company. At the time of his resignation, the defendant retained a binder containing a printed list of customer information concerning certain clients of his former employer, as well as other sensitive and confidential documents concerning plaintiff's clients. Rejecting the argument that the information retained by the defendant could be easily reconstructed from outside sources, the court held that:

> Various Skier employees compiled the client directory over many years at great expense and effort . . . Appellants' argument that a collection of easily obtainable information is not a trade secret is simply incorrect. Skier employees put time and effort into creating

> the directory. The fact that Gold could reconstruct that collection
> with lots of effort does not mean that the collection was not a trade
> secret.

*A.M. Skier*, 747 A.2d at 940. The court further emphasized that the information taken was password protected, that Skier's employee handbook provided that all such information was the property of the employer, and that the defendant had physically removed various directories and files of client information from the office in preparation for his resignation. Accordingly, the court held that injunctive relief was appropriate.

Here, the evidence demonstrates that the Alturnamats customer list was developed over many years through significant efforts by both Alturnamats management and Harry. Alternamats viewed the customer list as highly proprietary and, as discussed above, took great pains to protect it. The employee handbook issued to Harry contained a provision similar to that in *A.M. Skier* indicating that all confidential data, including customer contact information, was the sole property of Alturnamats and could not be removed from the premises without permission. Furthermore, as in *A.M. Skier*, Harry physically removed several items containing customer data upon his resignation.

We recognize that Pennsylvania courts generally "consider customer lists to be at the very periphery of the law of unfair competition." *Renee Beauty Salons, Inc. v. Blose-Venable*, 652 A.2d 1345, 1347 (Pa. Super. 1995). For that reason, "courts have denied protection to customer lists which are easily generated from trade journals, ordinary telephone listings, or an employee's general knowledge of who, in an established industry, is a potential customer for a given product." *National Risk Management, Inc. v. Bramwell*, 819 F.Supp. 417, 431 (E.D. Pa 1993); *see also Renee Beauty Salons*, 652 A.2d at 1349. In short, "[e]quity will not protect mere names and addresses easily ascertainable by observation or reference to directories." *Carl A. Colteryahn Dairy, Inc. v. Schneider Dairy*, 203 A.2d 469, 473 (Pa. 1964); *Spring Steels, Inc. v. Molloy*, 162 A.2d 370, 373 (Pa. 1960).

In *Colteryahn*, the Pennsylvania Supreme Court declined to extend protection to the identities of customers of a milk delivery service because it concluded that those identities were easily ascertainable with minimal effort:

> Route listings in the retail dairy industry cannot be considered as trade secrets so as to enjoin their use under common law principles. A normal driver would know which dairies were delivering to other people on the streets he was serving. . . . Also, if the identity of a majority of a competitor's route customers was desired, it could be ascertained without great difficulty in most instances; a delivery truck need only be followed during a period of one or two runs, the nature of the retail dairy business being such that most patrons would receive an order at least every few days. The time and expense of this tactic would be almost nominal.

*Colteryahn*, 203 A.2d at 772-73. In contrast, the evidence of record indicates that the list of Alturnamats dealers, as well Harry's handwritten information relative to each, was developed at great time and expense and that Alturnamats' dealer list could not be recreated with the ease discussed in *Colteryahn*. Indeed, Alturnamats does not list on its website the identities of its dealers. Moreover, despite having over 440,000 names in their ACCESS database, Signature was only able to match approximately half of the names contained in the list provided by Harry to their own database. Without Harry's list, however, Signature would not have been able to identify those entities as **Alturnamats dealers** or ascertained the information that Harry had acquired unique to each of them. Otherwise stated, those few "needles" in Signature's large "haystack" of a database would have been of little value to Signature.

In addition, we note that Harry did not have a "route" such as the milkman in Colteryahn with readily identifiable customers in the public domain. In the absence of acquiring Alturnamats' complete customer list, Signature could not have easily reconstructed it with minimal difficulty by utilizing any public source or following Harry around like the milkman in *Colteryahn*. As such, our facts are somewhat more akin to *Rouse*, where the district court granted trade secret protection to a list of customer names after noting that the defendant was only able to identify about 41% of the names on a stolen list after several days of full-time research in public listings and directories. *Rouse*, 495 F.Supp. at 530-31 ("To gather a nationwide listing of GBS franchisees from telephone directories would require more time and cost than could fairly be described as being 'easily or readily obtainable without great difficulty.'"). Indeed, we believe that the effort at reconstruction, in the absence of Harry's list, would be far more daunting than that in *Rouse*.

In *Renee Beauty*, the court rejected a hair styling salon's attempt to enjoin several former hairdressers from soliciting their prior clients after having left for a new employer. Unlike in the instant case, however, the court stressed that there was no evidence that the hairdressers had taken any lists of client information with them. *Id*. at 1349 ("There was no evidence presented, and defendants denied, that defendants had removed [a computer disk containing customer names] to obtain customer information, or had used the computer to print customer lists."). Moreover, the court emphasized the "intense relationships and loyalty to the service" that customers develop with their hairdressers because of the personal nature of the service provided. *Id*. In contrast, while the value of a charismatic salesperson like Harry cannot be underestimated, Rosan testified, and we so find, that the most important factor to customers in the ground protection industry is price.

In sum, we conclude that Alturnamats' customer list, under the unique facts of this case, is a protectable trade secret given the fact that it was the product of substantial effort and money; was regarded by Alturnamats as highly confidential; significant efforts were made to protect its secrecy; the list itself as well as information peculiar to each dealer was not easily accessible in the public domain; and its acquisition provided a competitive advantage to Signature in the portable ground protection industry.

We further find that Alturnamats has suffered and will continue to suffer irreparable harm if injunctive relief is not granted. The Pennsylvania Supreme Court has acknowledged, in the context of a violation of a restrictive covenant, that the enduring nature of such violations justifies equitable relief:

> It is not the initial breach of a covenant which necessarily establishes the existence of irreparable harm but rather the threat of the unbridled continuation of the violation and the resultant incalculable damage to the former employer's business that constitutes the justification for equitable intervention.

*John G. Bryant Co., Inc. v. Sling Testing & Repair*, 369 A.2d 1164, 1167 (Pa. 1977); *Olympic Paper*, 2000 WL 33711064, at *10; *see also Rollins Protective Services Co. v. Shaffer*, 557 A.2d 413, 415 (Pa. 1989) (stating that "'unwarranted interference with customer relationships' would constitute a threat of irreparable harm.").

Additionally, the issuance of the injunction will not cause greater harm to Harry and Signature than would befall Alturnamats were the injunction denied. Harry and Signature are not enjoined from selling ground protection mats to customers that they identify independently as a result of their own labor, but only from further solicitation of the customers whose information they obtained from the lists improperly taken by Harry. As noted in *Olympic Paper*:

> [T]he balance of harms waives in favor of granting the injunction since its denial could permit [defendants] to exploit and undermine certain of [plaintiff's] customer relationships. On the other hand, granting the injunction . . . would most likely not prevent [defendants] from making a living since there appear to be many other companies . . . whom they can solicit for the paper business . .

*Id.* at *11. Finally, we find that this decision is not one that will result in the public interest being negatively affected.

## C) Duty of Loyalty

Under Pennsylvania law, the duty of loyalty is implied in every employer-employee relationship, *Smith v. Unemployment Comp. Bd. Of Review*, 367 A.2d 811, 813 (Pa. Cmwlth. 1977), and an employee "owes his employer loyalty, diligence, fidelity, obedience, and above all, honesty." *Langensiepen v. Unemployment Comp. Bd. Of Review*, 451 A.2d 814, 816 (Pa. Cmwlth. 1982). In order to uphold his duty of loyalty, "[a]n employee must provide his employer with undivided loyalty and avoid conflicts of interest." *See Maritrans v. Pepper Hamilton & Sheetz*, 602 A.2d 1277, 1283 (Pa. 1922). Stated differently, "[n]o man can serve two masters." *SHV Coal, Inc. v. Continental Grain Co.*, 545 A.2d 91 (Pa. Super. Ct. 1988), rev'd on other grounds, 526 Pa. 489, 587 A.2d 702 (1991). Every agent "is subject to a duty not to act or to agree to act during the period of his agency for persons whose interests conflict with those of the principal in matters in which the agent is employed." *SHV Coal, Inc.* (citing Restatement (Second) of Agency § 394).

Plaintiff argues that Harry breached his duty of loyalty relative to his dealings with Sandvik. While we find, as discussed above, that injunctive relief is appropriate as a result of Harry's misappropriation of the customer lists, we refuse to find a separate breach of loyalty relative to

Harry's dealings with Sandvik. An employee may, prior to terminating his employment with his principal, make preparations to leave and work for a competitor:

> After the termination of his agency, in the absence of a restrictive agreement, the agent can properly compete with his principal as to matters for which he has been employed. Even before termination of the agency, he is entitled to make arrangements to compete, except that he cannot properly use confidential information peculiar to his employer's business and acquired therein. Thus, before the end of his employment, he can properly . . . upon termination of employment immediately compete.

*Spring Steels*, 162 A.2d at 375 (citing Restatement (Second) of Agency § 393, Comment e); *see also Arthur J. Gallagher & Co. v. Reisinger*, 2007 WL 1877895 (W.D.Pa. 2007).

Here, as discussed more fully above, we find that Harry did not take steps, while employed with Alturnamats, to divert the Sandvik business opportunity to Signature. Nor do we find, as previously discussed, that Harry shared confidential information with Signature relative to the Sandvik opportunity while employed with Alturnamats or subsequent thereto. Finally, as set forth above, Sandvik's decision to contract with Signature was driven solely by its own perceived economic interests. Consequently, Alturnamats' claim based upon the duty of loyalty fails.

### D) Breach of Contract - Gerald Harry

Under Pennsylvania law, the distribution of an employee handbook can result in a valid, enforceable contract where an employee manifests his understanding and agreement to abide by such terms and conditions. *Darlington v. General Electric*, 504 A.2d 306, 320 (Pa. Super. 1986), overruled on other grounds, *Clay v. Advanced Computer App., Inc.*, 559 A.2d 917 (Pa. 1989) (noting that an employee can be bound by provisions contained in an employee handbook by acknowledging such provisions and continuing to perform his job duties). However, it is the intention of the parties which is the ultimate guide, and "[i]t is well-settled that to find that a[n employee] handbook has legally binding contractual significance, the handbook or an oral representation about the handbook must in some way clearly state that it is to have such effect." *Luteran v. Loral Fairchild Corp.*, 688 A.2d 211, 215 (Pa. Super. Ct. 1997) (affirming grant of compulsory nonsuit on basis that employee

handbook did not create contract) (internal citations and quotations omitted). Thus, "[w]hile a contract may be implied from statements published in an employee handbook…a company…may prevent an employment guide from creating an implied contract by including a clear and prominent disclaimer." *Holodak v. Rullo*, No. 05-2141, 210 Fed. Appx. 147, 151 (3d Cir. 2006) (affirming grant of summary judgment on breach of implied covenant claim where employee handbook contained language disclaiming contract). Similarly, an employer's unfettered right to alter any provision of an arbitration agreement between it and an employee render the agreement illusory and unenforceable. *See Floss v. Ryan's Family Steak Houses, Inc.*, 211 F.3d 306 (6th Cir. 2000).

Here, the employee handbook distributed by Alturnamats to its employees in April, 2007, expressly reserved the unilateral right of Alturnamats to change, alter or delete portions of the handbook without notice to the employee and included the disclaimer that it does not form "any employment or personal contract, express or implied." Moreover, Gierlach testified and we find that the handbook was not intended to create an employment contract. Consequently, we conclude that the employee handbook does not create an independent basis for injunctive relief.

### E) Breach of Contract - Signature

Alturnamats contends that Signature breached the term of its Sales Agreement. Here, we find no evidence to support this breach of contract claim. Specifically, we find that Alturnamats has failed to prove that any confidential information outlined in the Agreement, such as the cost and pricing of ground protection mats, was disclosed to any third party. The Sales Agreement did not restrict Signature from competing against Alturnamats in the ground protection industry, but only from revealing particular confidential information. Because there is no evidence that Signature revealed details about pricing, quotations, incentives, or any other protected information to a third party, we find that Alturnamats breach of contract claim against Signature fails.

### F) Interference with Contractual Relationships

In order to make out a cause of action for intentional interference with prospective economic advantages, a plaintiff must satisfy the following elements: (1) the existence of a prospective contractual relation between the complainant and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual legal damage as the result of the defendant's conduct. *Blackwell v. NBC Stations Mgmt., Inc.*, 916 A.2d 1123, 1127-28 (Pa. Super. 2007). The critical inquiry is whether "'but for the wrongful acts of the defendant,' it is reasonably probable that the plaintiff would have established a contractual relation." *Id.* at 1128.

Pennsylvania courts have also relied upon the Restatement (Second) of Torts in adjudicating claims for interference with existing contracts or prospective contractual relations:

> One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm from loss of the benefits of the relation, whether the interference consists of:
>
> > (a) inducing or otherwise causing a third person not to enter into or continue a prospective relation or
> >
> > (b) preventing the other from acquiring or continuing the prospective relation.

Restatement (Second) of Torts § 766B. *See, Adler, Barish, Daniels, Levin, Etc. v. Epstein*, 482 Pa. 416, 393 A.2d 1175, (1978); *National Risk Management*, 819 F.Supp. at 433. Moreover, "[o]ne who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor ... does not interfere improperly with the other's relation if (a) the relation concerns a matter involved in the competition between the actor and the other and (b) the actor does not employ wrongful means and (c) his action does not create or continue an unlawful restraint of trade and (d) his purpose is at least in part to advance his interest in competing with the other." *Gilbert v. Otterson*, 550 A.2d 550, 554 (Pa.Super. 1988) (quoting Restatement (Second) of Torts, § 768).

We find that Alturnamats has failed to demonstrate that Signature interfered with a prospective contractual relationship. In short, Signature did not acquire Sandvik's business through

wrongful means. As discussed above, Harry breached no duty of loyalty relative thereto. Further, the evidence revealed that Sandvik had by no means reached a conclusion that it would contract with Alturnamats and, in fact, chose not to do so for reasons related solely to its own perceived economic interest. Consequently, Alturnamats claim based upon interference with a prospective contractual relationship fails.

Finally, Alturnamats also claims that Signature interfered with Alturnamats' existing contractual relationship with Harry by inducing him to leave Alturnamats for the purpose of harming and disrupting their business, rather than because Signature desired to obtain the services of Harry as a gifted salesman. *See Morgan's Home Equip.*, 136 A.2d at 847 (holding that it is unlawful to induce an employee to leave their present employment for a competitor where the purpose is to injure the competing business organization rather than to obtain a skilled or gifted employee). As discussed above, however, we find that Signature hired Harry exclusively because of his unique skills and charisma as a gifted salesman, rather than to intentionally cause harm to Alturnamats.

## CONCLUSION

As discussed more fully above, Signature stands to gain a significant competitive advantage from Harry's misappropriation of the Alturnamats customer lists if injunctive relief is not granted. Contrary to Alturnamats' request for an injunction of several years, we find, based upon a consideration of all relevant equitable factors, that an injunction of a shorter period will provide adequate protection to Alturnamats in this case. Accordingly, we issue the following order:

1.      IT IS HEREBY ORDERED that any property of Alturnamats that Harry physically misappropriated upon resignation, including rolodexes, daytimers, calenders, business cards, and reports generated from Alturnamats' QuickBook and Outlook computer programs, must be returned to Alturnamats immediately;

2.      IT IS HEREBY ORDERED that Signature delete or destroy those names, addresses, contact information, or other information determined to be "confidential" by the

findings and conclusions contained herein, that were misappropriated by Harry from Alturnamats and provided to Signature thereafter; and

3.    IT IS HEREBY ORDERED that Signature and Harry are enjoined and restrained from soliciting business from those customers of Alturnamats that appeared on the customer lists misappropriated by Harry for a period of ONE (1) YEAR from the date of this opinion.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ALTURNAMATS, INC., a Pennsylvania Corporation, | ) ) ) ) | |
| Plaintiff, | ) | |
| v. | ) ) | C.A. No. 07-337 Erie Judge McLaughlin |
| GERALD HARRY, an individual, and SIGNATURE FENCING AND FLOORING SYSTEMS, LLC (a/k/a SIGNATURE SYSTEMS, LLC) t/d/b/a DURADECK, a Delaware Corporation, | ) ) ) ) ) ) | |
| Defendants. | ) | |

## ORDER

AND NOW, this 16th day of September, 2008, and for the reasons set forth in the accompanying Memorandum Opinion,

1.　　IT IS HEREBY ORDERED that any property of Alturnamats that Harry physically misappropriated upon resignation, including rolodexes, daytimers, calenders, business cards, and reports generated from Alturnamats' QuickBook and Outlook computer programs, must be returned to Alturnamats immediately;

2.　　IT IS HEREBY ORDERED that Signature delete or destroy those names, addresses, contact information, or other information determined to be "confidential" by the findings and conclusions contained herein, that were misappropriated by Harry from Alturnamats and provided to Signature thereafter; and

3.　　IT IS HEREBY ORDERED that Signature and Harry are enjoined and restrained from soliciting business from those customers of Alturnamats that appeared on the

customer lists misappropriated by Harry for a period of ONE (1) YEAR from the date of this opinion.

IT IS SO ORDERED.

/s/ Sean J. McLaughlin
United States District Judge

cm: All parties of record. ___